UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CPLACE SPRINGHILL SNF, LLC,
d/b/a CARRINGTON PLACE OF SPRINGHILL,
a limited liability company,

        Plaintiff,

v.                                CASE NO. _____

SYLVIA MARY MATHEWS BURWELL,
in her official capacity as Secretary of the
United States Department of Health and
Human Services, and U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

        Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiff, CPLACE SPRINGHILL SNF, LLC, d/b/a CARRINGTON PLACE OF SPRINGHILL, a limited liability company ("Carrington Place"), brings this action against Defendants, SYLVIA MARY MATHEWS BURWELL ("Health Secretary"), in her official capacity as Secretary of the United States Department of Health and Human Services, and the U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"), to compel the Health Secretary and HHS to lift the Medicare payment suspension and prepayment review pending completion of all administrative appeals.

### Parties

1.    Plaintiff, Carrington Place, is a Louisiana limited liability company and a Medicare provider (Provider No. 19-5353), formerly known as Fountain View Nursing and Rehabilitation Center. Carrington Place is certified by Medicare as a skilled nursing facility. It is the only skilled nursing facility in Springhill, Webster Parish, Louisiana. Webster Parish is

designated by HHS, Health Resources and Services Administrator, as a medically underserved area: an area in which residents have a shortage of health services.

2.      Defendant, Sylvia Mary Mathews Burwell, is Secretary of HHS and is named as a party only in her official capacity.

3.      Defendant, HHS, is the federal agency which contains the Centers for Medicare & Medicaid Services ("CMS"), the agency within HHS that is responsible for administration of the Medicare and Medicaid programs and the actions at issue, 42 U.S.C. § 1395 et seq.

### Jurisdiction and Venue

4.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 (federal question), § 1651 (All Writs Act) and 42 U.S.C. § 405(g).

5.      This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331. Carrington Place desires to challenge the suspension action by exhausting its administrative appeals before seeking judicial review; however, under the unique circumstances here, federal court jurisdiction is available.  Generally, in Medicare cases of this type where a Medicare provider faces a payment suspension, the provider receives an initial determination or overpayment demand, which triggers four levels of administrative appeal culminating in the Health Secretary's final decision. Generally, the administrative appeals must be exhausted before a provider may bring an action in federal court.  *See* 42 U.S.C. § 1395ii, incorporating 42 U.S.C. § 405(h), to Medicare.  Recently enacted roadblocks in the administrative appeal process make it virtually impossible for Carrington Place to obtain relief before it will suffer irreparable harm from the payment suspension and prepayment review imposed by the Defendants and its contractor.

6.      On December 24, 2013, HHS announced that its administrative appeal process

had become so backlogged at the Administrative Law Judge ("ALJ") level that, effective July 15, 2013, it had imposed a moratorium on the assignment of new claim appeals to ALJs for hearing. Indications are that this moratorium is expected to last at least two years.  Carrington Place's challenge to the Health Secretary's suspension is adversely affected by this moratorium.  The backlog, currently estimated to include almost one million appeals, makes it virtually certain that Carrington Place's challenge, and the challenges of other similarly situated providers, will never be heard.

       7.      Backlog and delays in the Medicare administrative appeal process are the subject of three pending actions brought against the Health Secretary. *See Calif. Clinical Lab. Ass'n, et al. v. Sec. of Health & Human Servs.*, No. 1:14-CV-673-KBJ (filed in D. D.C. Apr. 18, 2014, HHS's motion to dismiss pending); *American Hospital Ass'n., et al. v. Burwell*, No. 1:14-CV-851-JEB (filed in D. D.C. May 22, 2014, plaintiffs' summary judgment motion and HHS motion to dismiss pending); *Lessler, et al. v. Burwell*, No. 3:14-CV-1230 (filed in D. Conn. Aug. 26, 2014, plaintiffs' motion to certify class pending).

       8.      Exhaustion of the administrative appeal process is futile.  Here, the Court possesses subject matter jurisdiction since there is no way for Carrington Place to have its claims reviewed pursuant to the administrative appeal process, there is complete preclusion, or a serious practical roadblock exists. *See Physician Hosps. of Amer. v. Sebelius*, 691 F.3d 649, 655 (5th Cir. 2012).

       9.      Venue is proper in the Western District of Louisiana, Shreveport Division pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1)(B)-(C).

**Factual Background**

**I.**      **Regulatory Structure for Medicare Payments to Skilled Nursing Facilities**

10.    The Medicare portions of the Social Security Act establish a national program of healthcare coverage for the aged and disabled (the "Medicare Act"). *See* 42 U.S.C. §§ 1395 – 1395kkk. Medicare Part A pays for covered services to, among others, hospitals and skilled nursing facilities. See 42 U.S.C. §§ 1395c-1395i-5.

11.    Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a beneficiary during a benefit period (*i.e.,* spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

12.    The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the beneficiary requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the beneficiary received treatment during a qualifying hospital stay or that arose while the beneficiary was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

13.    Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a beneficiary's admission to the nursing facility and to re-certify to the beneficiary's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

14.    To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical

personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

15.    In a recently settled class action case, plaintiffs alleged that Medicare contractors were inappropriately applying an "improvement standard" in making claims determinations for Medicare coverage involving skilled care. *See Jimmo et al. v. Sebelius,* No. 5:11-CV-17 (filed in D. Vt. Jan. 18, 2011, court approved settlement agreement Jan. 24, 2013). CMS clarified in the *Jimmo* settlement agreement that when skilled services are required in order to provide care that is reasonable and necessary to prevent or slow further deterioration, Medicare coverage cannot be denied based on the absence of potential for improvement or restoration. Medically necessary nursing and therapy services provided by or under the supervision of skilled personnel are covered by Medicare if the services are needed to maintain the beneficiary's condition, or prevent or slow their decline. Claims by providers of skilled nursing or rehabilitation services may not be denied solely based on a rule of thumb determination that a beneficiary's condition is not improving.

**A.    Suspension of Medicare Payments**

16.    The Health Secretary has overall responsibility for the Medicare program and has broad authority to "prescribe such regulations as may be necessary to carry out [its] administration[.]" 42 U.S.C. §§ 1395hh(a)(1).  CMS enters into contracts with private entities that assist in performing Medicare program activities. *See* 42 U.S.C. §§ 1395u; 1395ddd; 1395kk-1. CMS's contractors include Medicare Administrative Contractors ("MACs") and Zone Program Integrity Contractors ("ZPICs").

17.    ZPICs are authorized to perform reviews to prevent inappropriate expenditures and overpayments. *See* 42 C.F.R. Part 421, Subparts B, D, E. As part of their statutory duties, the

Health Secretary and her contractors can suspend Medicare payments to enrolled providers. *See* 42 C.F.R. § 405.371(a). During a payment suspension, valid payments to the Medicare provider are frozen and held in a suspension account. The suspension may last until the investigation is resolved. *See* 42 C.F.R. § 405.372(d)(3). Once the investigation resolves, CMS lifts the suspension, recoups any obligation owed to it or HHS, and pays any remaining funds to the provider. *See id.* at § 405.372(e).

18.     ZPICs are also authorized to perform prepayment reviews, which involve review of claims before they are processed and before initial determinations are issued.

19.     Medicare payment suspensions are not immediately subject to appeal, neither is the imposition of prepayment review. These remedies do not constitute an "initial determination" on a claim for benefits. *See* 42 C.F.R. §§ 405.920, .926. Administrative appeal rights attach once an adverse initial determination is made. *See id.*; *see also* 42 U.S.C. § 1395ff(a), (b).

20.     AdvanceMed is the ZPIC for Medicare Part A services covering Louisiana and performs payment suspensions and prepayment reviews on behalf of HHS.

21.     This case involves HHS's suspension pursuant to 42 C.F.R. § 405.371(a)(1) of Medicare payments owed to Carrington Place for skilled nursing facility services. HHS purportedly based the suspension, effective July 25, 2014, "on reliable information that an overpayment exists or that payments to be made may not be correct." The reliable information appears to be the ZPIC's findings that Carrington Place billed therapy services at a level beyond what was medically necessary for treatment of the Medicare beneficiaries.

22.     Prior notice of the suspension was not provided. HHS or its contractor erroneously applied the law in determining that Carrington Place's therapy services were not covered. For example, the ZPIC's findings overlooked the principles articulated in the *Jimmo*

settlement agreement.

**B.      Administrative Appeal Process**

23.      Under the Medicare Act, a party dissatisfied with a contractor's initial determination or overpayment calculation must go through four levels of administrative appeal before seeking judicial review: (1) redetermination; (2) reconsideration; (3) ALJ hearing; and (4) Departmental Appeals Board ("DAB") review.

24.      First, within 120 days of receiving an adverse initial determination, a provider must present its dispute to HHS by requesting redetermination by a MAC. *See* 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940-.958. An individual who was not involved in the initial determination decides timely requests for redetermination, generally within 60 days of receipt. *Id.* §§ 405.948, 405.950.

25.      Second, a provider who is dissatisfied with the redetermination decision can request reconsideration by a qualified independent contractor ("QIC"). *See* 42 U.S.C. § 1395ff(c); 42 C.F.R. § 405.960-.978. The QIC must have "sufficient medical, legal, and other expertise, including knowledge of the Medicare program." 42 C.F.R. § 405.968(c)(1). With certain exceptions, the QIC decides timely reconsideration requests within 60 days of receipt. *See id.* § 405.970.

26.      Third, if the QIC cannot meet its deadline, or the provider is dissatisfied with the reconsideration, it can request a hearing before an administrative law judge ("ALJ"). The ALJ generally issues a post-hearing decision within 90 days. *See* 42 C.F.R. §§ 405.1016, 405.1046(d), 405.1104.

27.      Fourth, if the provider is still not satisfied, it can request DAB review. *See* 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.1100-.1130. The DAB receives briefs and may hear oral

arguments. *See* 42 C.F.R. §§ 405.1120, 405.1124. The DAB generally issues a final decision within 90 days of receipt. *See id.* at § 405.1100(e). The DAB's decision is final, binding, and becomes the Health Secretary's final decision. *See id.* at §§ 405.1130, 405.1140.

28.     Under the general jurisdictional provision of the Social Security Act (§ 405(g)), incorporated into the Medicare Act by 42 U.S.C. § 1395ff(b)(1)(A)), only "final" administrative decisions made "after a hearing" may receive judicial review. The DAB typically will not issue a decision unless a provider completes all prior levels of administrative review. *See* 42 U.S.C. 1395ff(b)-(d). By its terms, § 405(g) specifically precludes subject matter jurisdiction prior to administrative exhaustion.

29.     The post-suspension appeal rights provided by HHS are inadequate.  Defendants have effectively denied Carrington Place's right to due process of law as guaranteed by the U.S. Constitution. As shown below, even with administrative appeal rights, the recent moratorium on ALJ appeal hearings and backlog of approximately one million appeals, demonstrate that administrative appeals are futile and any administrative exhaustion requirement should be deemed waived because of the irreparable harm the unlawful suspension has on Carrington Place, its residents, employees and the Springhill community.

**C.     The Administrative Appeals Process is Completely Broken**

30.     The administrative appeal process is completely backlogged and there is no way for Carrington Place to obtain  an adequate post-payment suspension hearing before an ALJ, there is complete preclusion, or a serious practical roadblock exists.  A roadblock at any level of the appeals process precludes meaningful review of Carrington Place's challenge and results in a denial of due process.

31.     On December 24, 2013, HHS's Office of Medicare Hearings and Appeals

("OMHA") issued a memorandum notifying parties in pending appeals of a moratorium on assignment of appeals to ALJs for at least two years. This two-year delay excludes post-assignment wait times that will exceed six months. *See* December 24, 2013, memorandum from Nancy J. Griswold, Chief Administrative Law Judge, to OMHA parties, attached and incorporated by reference as Exhibit "A."

32.     As of February 12, 2014, over 480,000 Medicare appeals were pending for assignment to an ALJ, with approximately 15,000 new appeals filed each week. The number of appeals before OMHA is estimated to be 950,000. OMHA is giving priority to appeals filed by Medicare beneficiaries; while providers like Carrington Place are placed at the end of the line.

33.     The last level of administrative appeal, the DAB, is also facing increased caseloads and, as a result, will encounter increased delays in issuing decisions. For example, at the end of fiscal year 2013, the DAB had approximately 4,888 pending appeals with an expected 7,000 additional appeals in 2014. The DAB has conceded that it is unlikely to meet its 90-day statutory deadline for issuing decisions.

34.     During a May 20, 2014, hearing of the U.S. House of Representatives Committee on Oversight and Government Reform, Subcommittee on Energy Policy, Health Care & Entitlements, legislators from both parties expressed concern that some Medicare providers were being unfairly punished. The subcommittee chairman, Rep. James Lankford (R-OK), compared the contractors used by HHS to track down erroneous payments to "bounty hunters" seeking enrichment. *See* May 20, 2014, Modern Healthcare article, "Legislators decry broken Medicare appeal process," attached and incorporated by reference as Exhibit "B." The ranking minority member of the subcommittee, Rep. Michelle Lujan Grisham (D-NM), was quoted as saying, "The due process system is broken." *Id.* Rep. Grisham and others expressed the view that small

providers with tight margins might not be able to afford the laborious appeals process. *Id.*

35.    Carrington Place is one of those small providers with a tight margin. It cannot afford the suspension, prepayment review, and delay — in effect, denial — of administrative appeals. The unfettered administrative action will bankrupt Carrington Place long before it will have a fair opportunity to present its case to an ALJ and recoup the withheld funds. Without judicial intervention, Carrington Place's challenge to the suspension will not be heard in a timely manner, if ever. In sum, the administrative appeals process is broken, dysfunctional, and unable to process Carrington Place's challenge to the unlawful suspension. Under these circumstances, the right to due process of law mandates the availability of judicial action to enjoin the suspension and hear Carrington Place's claims.

## II.    History of the Facility

36.    The skilled nursing facility has participated in Medicare since 2006.

37.    The prior operator was financially unsuccessful and the skilled nursing facility came into disrepair.

38.    In November, 2011, the skilled nursing facility's landlord brought in Carrington Place as a new tenant to turn the facility around.  Carrington Place acquired the prior operator's Medicare provider agreement and its Medicare overpayment of approximately $1,000,000, relating to a prior ZPIC audit.

39.    Carrington Place has been largely successful in turning the facility around, and has reduced the Medicare overpayment amount to approximately $845,000.

## III.    ZPIC Findings and HHS Suspension of all SNF payments

40.    AdvanceMed initiated a probe audit of Carrington Place's Medicare claims on approximately 10 beneficiaries (34 Medicare claims) with dates of service between January 1

and June 30, 2013.  On October 2, 2013, AdvanceMed notified Carrington Place that it was reopening the claims previously submitted for payment due to "credible evidence regarding allegations regarding your billing practices" and requested medical documentation supporting the services billed.

41.     On October 4, 2013, Carrington Place produced documentation supporting the requested claims.

42.     The Health Secretary, through the ZPIC (AdvanceMed), has not made an initial determination or given notice of an overpayment. Thus, Carrington Place is unable to initiate the administrative appeal process.

43.     On July 25, 2014, AdvanceMed sent Carrington Place a notice of suspension of Medicare payments pursuant to 42 C.F.R. § 405.371(a)(1), based on "reliable information that an overpayment exists or that the payments to be made may not be correct."  *See* 42 C.F.R. § 405.372. The letter indicated that Carrington Place "bills *therapy* services at a level above and beyond a level of necessity for treatment of patients." (emphasis added).  However, the Health Secretary, through CMS, suspended *all* of Carrington Place's Medicare payments, not just those relative to its therapy charges. The suspension took effect immediately and could last up to 180 days or longer in certain circumstances. *See* 42 C.F.R. § 405.372(d)(1), (2).

44.     Applicable regulations define the term "suspension" as Medicare's "withholding of payment" "before a determination of the amount of the overpayment exists." 42 C.F.R. § 405.372.

45.     The suspension notice identifies isolated incidents of alleged improper billing for therapy services, but does not seek additional records to facilitate calculation of an overpayment. AdvanceMed also initiated a prepayment process to review all of Carrington Place's Medicare

claims and supporting documentation prior to payment.

46.     On August 5, 2014, Carrington Place submitted a rebuttal statement to the notice of suspension, giving reasons why the suspension should be removed and attaching additional documentation supporting the denied therapy claims. Carrington Place immediately implemented policy changes and a corrective action plan to educate its personnel about Medicare's documentation requirements for therapy charges.  Carrington Place requested that AdvanceMed remove the suspension of Medicare payments to avoid the detrimental impact the suspension was having on its finances, residents, employees, and the Springhill community.

47.     On September 5, 2014, AdvanceMed notified Carrington Place that the suspension would continue. In response to Carrington Park's rebuttal and submission of additional documentation, AdvanceMed reversed portions of its previous determination that certain therapy services were not covered. While acknowledging that the initial denial rate "has already been reduced significantly," the Defendants decided to continue the payment suspension.

48.     On August 29, 2014, AdvanceMed sent Carrington Place another request for documentation regarding more than 100 additional claims with dates of service between January 1, 2011 and December 27, 2013, thus initiating a second ZPIC audit. This letter notified Carrington Place that its claims were being reopened due to "credible evidence regarding allegations regarding your billing practices."

49.     On October 9, 2014, Carrington Place submitted a supplemental rebuttal statement, requesting that Defendants terminate the payment suspension and prepayment review. This request was based on the significantly reduced denial rate determined after Carrington Place's submission of additional documentation and the adverse impact relocation would cause to the existing Medicare residents and others. By letter dated October 27, 2014, the Defendants

again refused to lift the payment suspension or prepayment review, referencing the position that its "determination is not appealable," but that Carrington Place "continues to have the right to appeal denied claims."

50.    At all times relevant to this action, Carrington Place has continued to provide skilled nursing services to Medicare beneficiaries, payment for which is currently due and owing to Carrington Place.

## IV.    Impact on Plaintiff, Its Residents and the Springhill Community

51.    The suspension and withholding of Carrington Place's Medicare funds has adversely impacted the facility, its residents and the Springhill community, and will continue to do so.

52.    Springhill, Louisiana is a rural community of 5,269 people. Carrington Place is the only skilled nursing facility in the town. As a result, Carrington Place cares for residents who are more frail and ill than most residents. Currently, 65 residents (82% of Carrington Place's total census) suffer from dementia, anxiety or depression. Thirty-one residents (40% of the total) are over age 80. Sixteen residents are admitted for hospice care (*i.e.,* diagnosed as having less than 6 months to live), five are completely disabled, eight currently use feeding tubes, two receive dialysis, and more than 10 require oxygen treatments.

53.    Carrington Place has a 16-bed secure unit designed to care for the most critical residents. The continued suspension and withholding of payment to Carrington Place may require critical residents to be transferred to other facilities, which would cause traumatic medical and mental health problems for the residents.

54.    Contrary to the Defendant's assertions, there is no practical alternative for Carrington Place's residents in the event its Medicare beneficiaries are transferred or the facility

is forced to close for financial reasons.   Access to needed care will be denied to frail and elderly residents. Springhill is located 4 miles from the Arkansas border in the northwest corner of Louisiana.   Although there are two skilled nursing facilities within seven miles of Springhill, they are in Arkansas and do not have a secure unit necessary to care for critical residents.   The Arkansas facilities often send residents to Carrington Place because they are not equipped to care for critical residents.   Other skilled nursing facilities are 19, 24 and 29 miles from Springhill, well beyond the ability of most resident families to visit regularly and stay in contact with their loved ones.

55.     The adverse impact from the suspension and withholding of Medicare funds is not limited to Carrington Place's residents.   More than 40 percent of Springhill households have one or more members over the age of 60, who want to stay "home" where relatives and friends can visit.   The median annual income is just under $16,000. Many family members and friends walk to Carrington Place to visit residents and lack transportation to visit loved ones if they were moved to another facility.   Going to "another state" is impractical and unlikely.

56.     Closure of Carrington Place would adversely affect its employees.   The town survived for years on mills that have long since closed making Carrington Place one of the largest employers in the town, employing 60 people.   Sixty-one percent of the employees provide the only source of income for their families.

57.     The unemployment rate of Springhill is above the state average.   Twenty-two percent of the population lives below the poverty level. The continued suspension and withholding of Medicare funds could lead to financial problems and closure of Carrington Place. Closure would present an undue hardship on the facility, its residents, employees, and the Springhill community.

58.     All conditions precedent to the filing and maintenance of this action have been met or satisfied, excused or are futile.

## COUNT I – VIOLATION OF CONSTITUTIONAL DUE PROCESS RIGHTS

59.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 58 above as if fully set forth below.

60.     This is a claim for violation of Carrington Place's right to due process of law guaranteed under the Fifth Amendment to the United States Constitution.

61.     Defendants violated Carrington Place's right to due process of law by, among other things, improperly imposing "suspension" of payments, without an adequate post-decision hearing.

62.     Defendants have acted in disregard to Carrington Place's rights and have converted funds to which Carrington Place is entitled by law.

63.     Accordingly, Defendants are liable for violating Carrington Place's right to due process of law.

WHEREFORE, Carrington Place demands that this Court issue preliminary injunctive relief from the acts, conduct and omissions described above, award costs of suit, and grant further relief, both at law and equity, to which Carrington Place may be justly entitled.

## COUNT II – PRELIMINARY INJUNCTIVE RELIEF

64.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 58 above as if fully set forth below.

65.     Carrington Place is entitled to preliminary injunctive relief requiring Defendants to immediately lift the suspension and prohibiting Defendants from withholding any earned reimbursement amounts owed to Carrington Place for care provided to Medicare beneficiaries

until such time that Carrington Place has completed the administrative appeals to which it is legally entitled.

66.     Over ten percent of Carrington Place's current residents are Medicare beneficiaries. If Defendants' actions are not immediately restrained, Carrington Place, its residents, employees, and the Springhill community, will suffer irreparable harm as Carrington Place will have to cease providing services to Medicare residents, transfer the residents to other facilities, lay-off its employees, and close the facility.

67.     The payment suspension endangers all Carrington Place's residents, not just those receiving Medicare benefits. The medically fragile residents at Carrington Place will be at serious risk of not receiving care to which they are entitled. Those losses will be incalculable. Indeed, the Health Secretary, through CMS, may find good cause exists *not* to suspend Medicare payments when "beneficiary access to items or services would be so jeopardized by a payment suspension in whole or part as to cause danger to life or health." 42 C.F.R. § 405.371(b)(1)(ii). Defendants acted arbitrarily and capriciously in deciding to continue the suspension after receiving Carrington Place's rebuttal statements

68.     Additionally, the Springhill community will suffer harm as Carrington Place's employees, the majority of whom are the sole source of income for their families, will lose their jobs.

69.     Finally, the value of Carrington Place's business is being diminished and the continuing damages incalculable. Indeed, only injunctive relief can avoid the destruction of Carrington Place's business.

70.     A virtual certainty exists that Carrington Place will prevail on the merits because Defendants have no claim to suspend all Medicare payments or delay all Medicare payments

through the prepayment review process. CMS's attorneys confirmed that Carrington Place's therapy denial rate has significantly decreased as a result of the additional documentation submitted.

71.    The harm Carrington Place faces outweighs the harm that Defendants would sustain if injunctive relief were granted. Indeed, the possibility of endangering Carrington Place's residents and destruction of its business before exhaustion of administrative appeals is a much greater harm than Defendants' relinquishment of funds to which they are not entitled to recover by law.

72.    There is a compelling public interest in providing timely and uninterrupted health care services and reimbursement for Carrington Place's sick and frail Medicare beneficiaries.

73.    As a result of the foregoing, Carrington Place has no adequate remedy at law.

74.    Accordingly, Carrington Place seeks an injunction against Defendants from continuing the payment suspension and prepayment review.

75.    Carrington Place is willing to post a bond, if the Court deems it appropriate and necessary.

76.    Carrington Place asks this Court to set its motion for preliminary injunction for hearing at the earliest possible time and, after hearing the motion, issue a preliminary injunction

WHEREFORE, Carrington Place demands that this Court issue preliminary injunctive relief from the acts, conduct and omissions described above, award costs of suit, and grant such further relief, both at law and equity, to which Carrington Place may be justly entitled.

## COUNT III - PERMANENT INJUNCTIVE RELIEF

77.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 58 and 65 through 76 above as if fully set forth below.

78.     Carrington Place is entitled to permanent injunctive relief that would prevent further violation of its rights by, among other things, continuing the unlawful payment suspension and prepayment review.

79.     Carrington Park asks this Court to set its request for a permanent injunction for a full trial on the merits and, after the hearing, issue a permanent injunction against Defendants from continuing the payment suspension and prepayment review.

WHEREFORE, Carrington Place demands that this Court issue permanent injunctive relief from the acts, conduct and omissions described above, award costs of suit, and grant such further relief, both at law and at equity, to which Carrington Place may be justly entitled.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing Complaint and that the facts stated in it are true to the best of my information and belief.

CPLACE SPRINGHILL SNF, LLC
d/b/a CARRINGTON PLACE OF SPRINGHIL

By: _Ben Atkins, Manager_

STATE OF _FLORIDA_
COUNTY OF _PINELLAS_

SWORN TO (or AFFIRMED) AND SUBSCRIBED before me this _29TH_ day of October, 2014, by _Ben Atkins_ as _Manager_ of CPlace Springhill SNF, LLC d/b/a Carrington Place of Springhill.  He is personally known to me or has produced a _____ as identification.

JAMES ROCKY DAVIS
Notary Public - State of Florida
My Comm Expires Nov 26, 2016
Commission # FF 147118

_____
(Signature of Notary Public)

_____
(Typed name of Notary Public)
Notary Public, State of _____
Commission No. _____
My commission expires:

**BROAD AND CASSEL**
*Attorneys for Plaintiff*

By:

Michael J. Bittman, P.A.
Florida Bar No. 0347132
Board Certified Health Lawyer
Kimberly Doud, Esquire
Florida Bar No. 0523771
Bank of America Building
390 N. Orange Ave., Ste. 1400
Orlando, FL 32801
Telephone: (407) 839-4200
Facsimile:  (407) 839-2122
mbittman@broadandcassel.com
kdoud@broadandcassel.com
cpittman@broadandcassel.com

**LESTER J. PERLING, P.A.**
Florida Bar No. 13854
Board Certified Health Lawyer
One Financial Plaza, Suite 2700
Fort Lauderdale, Florida 33394
Telephone: (954) 764-7060
Facsimile:  (954) 713-0968
lperling@broadandcassel.com

**LAWRENCE W. PETTIETTE, JR.**
Pettiette Armand Dunkelman
Woodley Byrd Cromwell, L.L.P.
400 Texas Street
Suite 400
Shreveport, Louisiana  71101
Telephone:     (318) 221-1800
Fax:             (318) 226-0390
lpettiette@padwbc.com