UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CPLACE SPRINGHILL SNF, LLC,
d/b/a CARRINGTON PLACE OF SPRINGHILL,
a limited liability company,

Plaintiff,

v. CASE NO. ____________

SYLVIA MARY MATHEWS BURWELL,
in her official capacity as Secretary of the
United States Department of Health and
Human Services, and U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

Defendants.
_______________________________/

**PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND**
**MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiff, CPLACE SPRINGHILL SNF, LLC, d/b/a CARRINGTON PLACE OF SPRINGHILL, a limited liability company ("Carrington Place"), pursuant to Rule 65, Federal Rules of Civil Procedure, hereby moves this Court for a temporary restraining order and preliminary injunction seeking to enjoin certain actions of Defendants, SYLVIA MARY MATHEWS BURWELL ("Health Secretary"), in her official capacity as Secretary of the United States Department of Health and Human Services, and the U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"). For the reasons explained more fully below and as demonstrated in Plaintiff's Verified Complaint, this Court should issue a temporary restraining order ("TRO") and, after an appropriate hearing, issue a preliminary injunction enjoining suspension of Plaintiff's Medicare payments and prepayment review of claims for skilled nursing facility services rendered to Medicare Part A beneficiaries. Plaintiff requests this Court to

dispense with the bond requirement or set a *de minimis* bond amount because the TRO and preliminary injunction will not prejudice Defendants or cause any monetary damages.

## Memorandum of Law

### I. Factual Background

#### A. Carrington Place and the Springhill Community

Plaintiff, Carrington Place, is a Louisiana limited liability company and a Medicare provider (Provider No. 19-5353), formerly known as Fountain View Nursing and Rehabilitation Center. Carrington Place is the only skilled nursing facility in Springhill, Webster Parish, Louisiana, a rural community of approximately 5,300 people. HHS, Health Resources and Services Administrator, designated Webster Parish as a medically underserved area: an area in which residents have a shortage of health services.

Carrington Place provides necessary skilled nursing care to residents considered to have a high acuity level. Currently, 65 residents – 82% of all facility residents – suffer from dementia, anxiety or depression. Thirty-one residents – 40% of all facility residents – are 80 years old or older. Sixteen residents are under hospice care (*i.e.*, diagnosed as having less than six months to live), five are completely disabled, eight currently use feeding tubes, two receive dialysis, and more than 10 require oxygen treatment. Carrington Place has a 16-bed secure unit designed to care for the most critical residents.

There is no practical alternative for Carrington Place's residents in the event its Medicare beneficiaries are transferred or the facility is forced to close for financial reasons. Springhill is located 4 miles from the Arkansas border in the northwest corner of Louisiana. Although there are two skilled nursing facilities within seven miles of Springhill, they are in Arkansas and do not have a secure unit necessary to care for critical residents. The Arkansas facilities often send

their residents to Carrington Place because they are not equipped to care for critical residents. Other skilled nursing facilities are 19, 24 and 29 miles from Springhill, well beyond the ability of most residents' families to visit regularly and stay in contact with their loved ones.

Springhill's unemployment rate is above the state average. Springhill survived for years on mills that have long since closed. The median annual income is just under $16,000. Twenty-two percent of the population lives below the poverty level. Carrington Place is one of the largest employers in the town, employing 60 people. Sixty-one percent of the employees are the only source of income for their families.

The prior operator, Fountain View Nursing and Rehabilitation Center, was financially unsuccessful and the skilled nursing facility came into disrepair. In November, 2011, the skilled nursing facility's landlord brought in Carrington Place as a new tenant to turn the facility around. Carrington Place acquired the prior operator's Medicare provider agreement and its Medicare overpayment of approximately $1,000,000, relating to a prior Medicare audit. Since taking over, Carrington Place has corrected many problems the prior provider left behind and has been successful in turning the facility around. Carrington Place has reduced the Medicare overpayment incurred by the prior operator to approximately $845,000.

### B. Regulatory Structure for Medicare Payments to Skilled Nursing Facilities

The Medicare portions of the Social Security Act establish a national program of healthcare coverage for the aged and disabled (the "Medicare Act"). *See* 42 U.S.C. §§ 1395 – 1395kkk. Medicare Part A pays for covered services to, among others, hospitals and skilled nursing facilities. *See* 42 U.S.C. §§ 1395c-1395i-5. Subject to certain conditions, Medicare Part A covers beneficiaries for skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. *See* 42 U.S.C. §

1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c). The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the beneficiary requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the beneficiary received treatment during a qualifying hospital stay or that arose while the beneficiary was receiving care in a SNF (for a condition treated during the hospital stay). *See* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b). Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a resident's admission to the SNF and to re-certify the resident's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

In a recent class action case, plaintiffs alleged that Medicare contractors were inappropriately applying an "improvement standard" in making claims determinations for Medicare coverage involving skilled care. *See Jimmo et al. v. Sebelius,* No. 5:11-CV-17 (filed in D. Vt. Jan. 18, 2011, court approved settlement agreement Jan 24, 2013). In the settlement agreement, CMS clarified that when skilled services are required to provide care that is reasonable and necessary to prevent or slow further deterioration, Medicare coverage cannot be denied based on the absence of potential for improvement or restoration. Medicare covers

medically necessary nursing and therapy services provided by or under the supervision of skilled personnel if those services are needed to maintain a beneficiary's condition, or prevent or slow the beneficiary's decline. Claims of providers furnishing skilled nursing or rehabilitation services may not be denied solely based on a rule of thumb determination that a beneficiary's condition is not improving.

**C. Suspension of Medicare Payments**

The Health Secretary has overall responsibility for the Medicare program and has broad authority to "prescribe such regulations as may be necessary to carry out [its] administration[.]" 42 U.S.C. §§ 1395hh(a)(1). Centers for Medicare & Medicaid Services ("CMS"), the agency within HHS that is responsible for administration of the Medicare and Medicaid programs, 42 U.S.C. § 1395 et seq., enters into contracts with private entities that assist in performing Medicare program activities. *See* 42 U.S.C. §§ 1395u; 1395ddd; 1395kk-1. CMS's contractors include Medicare Administrative Contractors ("MACs") and Zone Program Integrity Contractors ("ZPICs").

As part of their statutory duties, the Health Secretary and her contractors can suspend Medicare payments to enrolled providers. *See* 42 C.F.R. § 405.371(a). During a payment suspension, valid payments to the Medicare provider are frozen and held in a suspension account. The suspension may last until the investigation is resolved. *See* 42 C.F.R. § 405.372(d)(3). Once the investigation resolves, CMS lifts the suspension, recoups any obligation owed, and pays any remaining funds to the provider. *See id.* at § 405.372(e).

ZPICs are authorized to perform prepayment reviews. During prepayment review, contractors review claims before the claims are processed and initial determinations are made. AdvanceMed is the ZPIC for Medicare Part A services covering Louisiana and performs

payment suspensions and prepayment reviews on behalf of HHS.

Neither Medicare payment suspensions nor imposition of prepayment review are immediately subject to administrative appeal. Suspension and prepayment review do not constitute an "initial determination" on a claim for benefits. *See* 42 C.F.R. §§ 405.920, .926. Administrative appeal rights attach once an adverse initial determination or overpayment demand is made. *See id.*; *see also* 42 U.S.C. § 1395ff(a), (b).

**D. Administrative Appeal Process**

Under the Medicare Act, a party dissatisfied with a contractor's initial determination or overpayment calculation must go through four levels of administrative appeal before seeking judicial review: (1) redetermination; (2) reconsideration; (3) a hearing before an administrative law judge ("ALJ"); and (4) Departmental Appeals Board ("DAB") review. First, within 120 days of receiving an adverse initial determination, a provider must present its dispute to HHS by requesting redetermination by a MAC. *See* 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.940-.958. An individual who was not involved in the initial determination decides timely requests for redetermination. *Id.* §§ 405.948, 405.950.

Second, a provider who is dissatisfied with the redetermination decision can request reconsideration by a qualified independent contractor ("QIC"). *See* 42 U.S.C. § 1395ff(c); 42 C.F.R. § 405.960-.978. The QIC must have "sufficient medical, legal, and other expertise, including knowledge of the Medicare program." 42 C.F.R. §§ 405.968(c)(1), 405.970.

Third, if the QIC cannot meet its deadline, or the provider is dissatisfied with the reconsideration, the provider can request an ALJ hearing. *See* 42 C.F.R. §§ 405.1016, .1046(d); .1104.

Fourth, if the provider is still not satisfied, it can request DAB review. *See* 42 U.S.C. §

1395ff(d)(2); 42 C.F.R. §§ 405.1100-.1130. The DAB receives briefs and may hear oral arguments. *See* 42 C.F.R. §§ 405.1120, 405.1124. The DAB's decision is final, binding, and becomes the Health Secretary's final decision. *See* 42 C.F.R. §§ 405.1100(e), 405.1130, 405.1140.

Under the general jurisdictional provision of the Social Security Act (§ 405(g)), incorporated into the Medicare Act by 42 U.S.C. § 1395ff(b)(1)(A)), only "final" administrative decisions made "after a hearing" may receive judicial review. The DAB typically will not issue a decision unless a provider completes all prior levels of administrative review. *See* 42 U.S.C. 1395ff(b)-(d). By its terms, § 405(g) specifically precludes subject matter jurisdiction before exhaustion of administrative appeals.

**E. The Administrative Appeals Process is Completely Broken**

Subject matter jurisdiction exists in this case because the administrative appeal process established by Congress is completely backlogged and there is no way for Carrington Place to recover suspension amounts through the administrative appeal process before it will experience insolvency. Under the circumstances presented in which administrative remedies are virtually non-existent, there is complete preclusion of, and a serious practical roadblock to, administrative remedies.

On December 24, 2013, HHS's Office of Medicare Hearings and Appeals ("OMHA") issued a memorandum notifying parties in pending appeals of a moratorium on assignment of appeals to ALJs for at least two years. This two-year delay excludes post-assignment wait times that will exceed six months. *See* December 24, 2013, memorandum from Nancy J. Griswold, Chief Administrative Law Judge, to OMHA parties, a copy of which is attached to the Verified Complaint as Exhibit "A" and incorporated herein by reference.

As of February 12, 2014, over 480,000 Medicare appeals were awaiting ALJ assignment, with approximately 15,000 new appeals filed each week. The number of appeals before OMHA is estimated to be 950,000. Medicare beneficiary appeals receive priority, while providers like Carrington Place are placed at the end of the line.

The last level of administrative appeal, the DAB, faces increased caseloads and, as a result, will encounter increased delays in issuing decisions. For example, at the end of fiscal year 2013, the DAB had approximately 4,888 pending appeals with an expected 7,000 additional appeals in 2014. The DAB has conceded that it is unlikely to meet its 90-day statutory deadline for issuing decisions.

During a May 20, 2014, hearing of the U.S. House of Representatives Committee on Oversight and Government Reform, Subcommittee on Energy Policy, Health Care & Entitlements, legislators from both parties expressed concern that some Medicare providers were being unfairly punished. The subcommittee chairman, Rep. James Lankford (R-OK), compared HHS contractors investigating erroneous payments to "bounty hunters" seeking enrichment. *See* May 20, 2014, Modern Healthcare article, "Legislators decry broken Medicare appeal process," a copy of which is attached to the Verified Complaint as Exhibit "B" and incorporated herein by reference. The ranking minority member of the subcommittee, Rep. Michelle Lujan Grisham (D-NM) said, "The due process system is broken." *Id.* Rep. Grisham and others expressed the view that small providers with tight margins might not be able to afford the laborious appeals process. *Id.*

**G. ZPIC Audit of Carrington Place**

AdvanceMed initiated a probe audit of Carrington Place's Medicare claims on approximately 10 beneficiaries (34 Medicare claims) with dates of service between January 1

and June 30, 2013. On October 2, 2013, AdvanceMed notified Carrington Place that it was reopening the claims previously submitted for payment due to "credible evidence regarding allegations regarding your billing practices" and requested medical documentation supporting the services billed. On October 4, 2013, Carrington Place produced documentation supporting the requested claims.

On July 25, 2014, AdvanceMed sent Carrington Place a notice of suspension of Medicare payments pursuant to 42 C.F.R. § 405.371(a)(1), based on "reliable information that an overpayment exists or that the payments to be made may not be correct." *See* 42 C.F.R. § 405.372. The letter indicated that Carrington Place "bills ***therapy*** services at a level above and beyond a level of necessity for treatment of patients." (emphasis added). However, the Health Secretary, through CMS, suspended ***all*** of Carrington Place's Medicare payments, not just those relative to its therapy charges. The suspension took effect immediately and could last up to 180 days or longer in certain circumstances. *See* 42 C.F.R. § 405.372(d)(1), (2).

Applicable regulations define the term "suspension" as Medicare's "withholding of payment" "before a determination of the amount of the overpayment exists." 42 C.F.R. § 405.372. The suspension notice identifies isolated incidents of alleged improper billing for therapy services. AdvanceMed also initiated a prepayment review of all of Carrington Place's Medicare claims, requiring Carrington Place to furnish all supporting documentation before processing of the claim.

On August 5, 2014, Carrington Place submitted a rebuttal statement to the notice of suspension and addressed why the suspension should be removed. Carrington Place included additional documentation supporting the claims in question. Carrington Place immediately implemented policy changes and a corrective action plan to educate its personnel about

Medicare's documentation requirements for therapy charges. Carrington Place requested that AdvanceMed remove the suspension of Medicare payments to avoid the detrimental impact the suspension was having on its finances, residents, employees, and the Springhill community.

On August 29, 2014, AdvanceMed sent Carrington Place another request for documentation regarding more than 100 additional claims with dates of service between January 1, 2011 and December 27, 2013, thus initiating a second ZPIC audit. This letter notified Carrington Place that its claims were being reopened due to "credible evidence regarding allegations regarding your billing practices." At all times relevant to this action, Carrington Place has continued to provide skilled nursing services to Medicare beneficiaries, payment for which is currently due and owing to Carrington Place.

On September 5, 2014, AdvanceMed notified Carrington Place that the suspension would continue. In response to Carrington Park's rebuttal and submission of additional documentation, AdvanceMed reversed portions of its previous determination and agreed that certain previously denied therapy services were, in fact, covered by Medicare. Defendants have not made an initial determination or given notice of an overpayment. Carrington Place has made numerous requests to Defendants and the ZPIC (AdvanceMed), to end the payment suspension and prepayment review, but those requests have been denied or ignored.

On October 9, 2014, Carrington Place submitted a supplemental rebuttal statement, requesting that Defendants terminate the payment suspension and prepayment review. This request was based on the significantly reduced denial rate determined after Carrington Place's submission of additional documentation and the adverse impact relocation would cause to the existing Medicare residents and others. By letter dated October 27, 2014, the Defendants again refused to lift the payment suspension or prepayment review, referencing the position that its

"determination is not appealable," but that Carrington Place "continues to have the right to appeal denied claims."

HHS or its contractor erroneously applied the law in determining that Carrington Place's therapy services were not covered. For example, the ZPIC's findings overlooked the principles articulated in the *Jimmo* settlement agreement.

By imposing payment suspension and prepayment review, Defendants have effectively denied Carrington Place's right to due process of law. Even with post-suspension administrative appeal rights, the recent moratorium on ALJ appeal hearings and backlog of approximately one million appeals demonstrate that administrative appeals are futile. Any administrative exhaustion requirement should be deemed waived because of the irreparable harm the suspension and prepayment review has on Carrington Place, its residents, employees and the Springhill community.

Carrington Place is one of those small providers Rep. Grisham referenced during the recent congressional hearing. It cannot afford the suspension, prepayment review, and delay — in effect, denial — of administrative appeals. The unfettered administrative action will bankrupt Carrington Place long before it will have a fair opportunity to present its case to an ALJ and recoup the withheld funds. Without judicial intervention, Carrington Place's claims that the continued suspension is unwarranted and that the amount withheld exceeds the amount owed, if any, will not be heard in a timely manner, if ever. In sum, the administrative appeals process is broken, dysfunctional, and unable to process Carrington Place's challenge to the suspension and prepayment review. Under these circumstances, the right to due process of law mandates the availability of judicial action to preserve the status quo and enjoin the suspension and prepayment review.

## II. Legal Argument

This case involves HHS's July 25, 2014 suspension and prepayment review which effectively freezes all Medicare payments owed to Carrington Place for skilled nursing facility services.

### A. This Court has Jurisdiction over this Matter.

This Court possesses subject matter jurisdiction under several statutes: 28 U.S.C. §§ 1331 (federal question), 1651 (All Writs Act), and 42 U.S.C. § 405(g). Carrington Place desires to challenge the suspension action in an administrative appeal before seeking judicial review. Generally, in Medicare cases of this type where a Medicare provider faces suspension, the provider must receive an initial determination or overpayment notice and then complete each of four levels of administrative appeal culminating in the Health Secretary's final decision, before resorting to federal court. *See* 42 U.S.C. § 1395ii, incorporating 42 U.S.C. § 405(h), to Medicare. However, the recent roadblocks in the administrative appeal process make it virtually impossible for Carrington Place to initiate and exhaust the administrative appeal process. Under the unique circumstances here, federal court jurisdiction must be immediately available.

On December 24, 2013, HHS announced that its administrative appeal process had become so backlogged at the ALJ level that, effective July 15, 2013, it had imposed a moratorium on the assignment of new claim appeals to ALJs for hearing. Indications are that this moratorium is expected to last at least two years. This moratorium adversely affects Carrington Place's ability to recoup suspended Medicare funds to which it is entitled. The backlog, currently estimated to include almost one million appeals, makes it virtually certain that Carrington Place's challenge, and the challenges of other similarly situated providers, will never

be heard or will be heard well after insolvency caused by Defendants' freezing of all Medicare reimbursement.[1]

Exhaustion of the administrative appeal process is futile. This Court possesses subject matter jurisdiction because no way exists for Carrington Place to have its challenge to payment suspension heard pursuant to the administrative appeal process, there is complete preclusion, or a serious practical roadblock exists. *See Physician Hosps. of Amer. v. Sebelius*, 691 F.3d 649, 655 (5th Cir. 2012).

### B. This Court is Authorized to Issue A Preliminary Injunction Enjoining Payment Suspension.

Rule 65, Federal Rules of Civil Procedure, allows a district court to issue a preliminary injunction upon notice to the adverse party. Plaintiff must establish four elements to secure a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *See Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011); *New Orleans Home for Incurables, Inc. v. Greenstein*, 911 F.Supp.2d 386, 406 (E.D. La. 2012). Here, Plaintiff meets each of these requirements.

#### 1. Substantial Likelihood of Success on the Merits

As set forth in the Verified Complaint, Plaintiff has demonstrated a substantial likelihood of success on the merits of its claims. "Due process ensures 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* at 404. Plaintiff is a skilled nursing facility

---

[1] Backlog and delays in the Medicare administrative appeal process are the subject of three pending actions brought against the Health Secretary. *See Calif. Clinical Lab. Ass'n., et al. v. Sec. of Health & Human Servs.*, No. 1:14-CV-673-KBJ (filed in D. D.C. Apr. 18, 2014, HHS's motion to dismiss pending); *American Hospital Ass'n., et al. v. Burwell*, No. 1:14-CV-851-JEB (filed in D. D.C. May 22, 2014, plaintiffs' summary judgment motion and HHS motion to dismiss pending); *Lessler, et al. v.*

participating in the Medicare program and is accorded procedural due process rights under 42 U.S.C. § 1395ff and 42 C.F.R. §§ 405.90 to 405.1140.

Defendants have breached their statutory duties and acted in derogation of law. Defendants have allowed OMHA to suspend the assignment of all new provider appeals to ALJs for approximately twenty-four months. Defendants' delays, most notably at the ALJ level, plainly violate the timetables Congress set forth in the Medicare Act. Defendants' delays in resolving Medicare appeals affect human health and welfare and compromise the economic well-being of providers across the country, including Carrington Place. As a result, the Health Secretary has effectively denied Carrington Place its administrative remedies and violated its right to due process of law.

A virtual certainty exists that Carrington Place will prevail on the merits because Defendants have no grounds to continue the suspension of all Medicare payments or delay all Medicare payments through the prepayment review process when the alleged incorrect payments (or overpayments) relate solely to therapy services. Defendants have no right to continue the suspension and prepayment review indefinitely, while administrative appeals are either unavailable or futile.

### 2. Irreparable Injury

A substantial threat of irreparable injury exists to Carrington Place, its residents, employees, and the Springhill community, if the injunction is not issued. In its Verified Complaint and above on page 2, Carrington Place has explained the medical frailty of its residents. More than 10 percent of Carrington Place's current residents are Medicare beneficiaries. Without injunctive relief, these fragile and vulnerable residents will face discharge or transfer, either of which will cause irreparable harm to their health. Moving frail and elderly

---

*Burwell*, No. 3:14-CV-1230 (filed in D. Conn. Aug. 26, 2014, plaintiffs' motion to certify class pending).

residents greatly increases the risks of further infection, physical injuries, mental distress and other medical complications. Some residents may not survive the move.

Carrington Place's non-Medicare residents suffer from life threatening conditions and need specialized care. Carrington Place cares for residents who are dependent on ventilators, feeding tubes, dialysis and other systemic assistance, including residents who reside in the 16-bed secure unit designed to care for the most critical residents. It would be impossible to relocate those residents as nearby health care facilities are not equipped to treat those with such medically complex issues. Nearby facilities will not accept Carrington Place's most critical residents, and those residents cannot be appropriately treated in a facility with a lower level of care. The Health Secretary, through CMS, may refrain from suspending Medicare payments when "beneficiary access to items or services would be so jeopardized by a payment suspension in whole or part as to cause danger to life or health." 42 C.F.R. § 405.371(b)(1)(ii). Despite Carrington Place's pleas, the Defendants have arbitrarily and capriciously refused to end the suspension and prepayment review.

Carrington Place must protect its residents' health and may assert harm to its residents as "irreparable harm" in seeking a preliminary injunction. *See Oak Park Health Care Center, LLC v. Johnson*, 2009 WL 331563, *3 (W.D. La. Feb. 10, 2009) (citing *Mediplex of Massachusetts, Inc. v. Shalala*, 39 F.Supp.2d 88 (D. Mass. 1999)).[2] For example, in *Mediplex*, the court considered the interests of skilled nursing facility residents in evaluating irreparable harm for purposes of granting a preliminary injunction to prevent termination of that provider's Medicare and Medicaid agreements. *See Mediplex*, 39 F.Supp. 2d at 98-100. The court found that "the

[2] *See also Peak Medical Oklahoma No. 5, Inc. v. Sebelius*, 2010 WL4809319, *3 (N.D. Okla., Nov. 18, 2010) (facility "certainly has an interest in potential harm to its residents and employees . . . [which] arguably constitutes harm befalling" facility. "Failure to consider this interest for the purposes of the irreparable harm analysis is disingenuous and **ignores the reality of this situation**") (emphasis added).

potential for transfer trauma [of the residents] has been established, leading to potential harm of substantial dimensions should the preliminary injunction plaintiff seeks not be entered." *Id.* at 100. The same is true here. Transfer trauma is a very real danger to Carrington Place's residents, who are seriously ill and more fragile than those in *Mediplex*.

Similarly, in granting the temporary restraining order in *Oak Park*, the court concluded:

> Terminating provider benefits to a nursing home would require an extremely vulnerable population to undergo the trauma of moving to a new facility. The irreparable injury is not limited to the patients, as the burden often falls on the family members to locate a suitable facility, especially here where the majority of residents are either mentally impaired or suffering from mental illness. Moreover, in today's fragile economic climate, this Court is also cognizant of the effect a closure would have on Oak Park's employees.

*Oak Park*, 2009 WL 331563 at *3.

Defendants' suspension and prepayment review also impacts Carrington Place's business, its employees and the Springhill community. Employees, the majority of whom are the sole source of income for their families, may lose their jobs, adding those individuals to the already high number of Springhill's unemployed and resulting in not only a loss of income but also a loss of health insurance coverage for many families. The value of Carrington Place's business is being diminished and the continuing damages incalculable. Carrington Place cannot afford the suspension, prepayment review, and delay — in effect, denial — of administrative appeals. The potential economic loss to Carrington Place is significant. Indeed, only injunctive relief can avoid destruction of Carrington Place's business.

If Defendants' actions are not immediately restrained, Carrington Place, its residents, employees, and the Springhill community, will suffer irreparable harm as Carrington Place will have to cease providing services to Medicare residents, transfer the residents to other facilities, lay-off its employees, and, ultimately close the facility.

### 3. Threatened Injury Exceeds Harm of Injunction

The harm Carrington Place faces outweighs the harm that Defendants would sustain if injunctive relief were granted. The possibility of endangering Carrington Place's residents and destruction of its business before exhaustion of administrative appeals is a much greater harm than Defendants' immediate cessation of the suspension and prepayment review. This motion does not seek from Defendants the return of Medicare funds previously withheld; only that the suspension in effect since July 25, 2014, and the prepayment review, be immediately enjoined, so that Carrington Place may receive payments for providing SNF services to its Medicare residents. Defendants will suffer no harm from the TRO and preliminary injunction. *See Oak Park*, 2009 WL 331563 at *3.

### 4. Public Interest

A preliminary injunction will serve the public interest. There is a compelling public interest in providing timely and uninterrupted health care services to frail elderly residents in need of skilled care. *See id.* Cessation of the suspension and prepayment review will restore some cash flow to Carrington Place for its SNF services to Medicare residents. A preliminary injunction would maintain the status quo by terminating the suspension and prepayment review, allowing Carrington Place to keep its doors open while this litigation is resolved.

## III. Conclusion

Defendants violated Carrington Place's right to due process of law by, among other things, refusing to lift the suspension or prepayment review, and by not providing an adequate post-suspension hearing. Defendants have acted arbitrarily and capriciously and have withheld from Carrington Place Medicare reimbursement to which Carrington Place is lawfully entitled.

Carrington Place has established that it will prevail on its claim for injunctive relief

requiring Defendants to lift the suspension and prepayment review. Carrington Place has demonstrated that its business, as well as the interests of its residents and the Springhill community, will suffer irreparable harm absent injunctive relief. An injunction will not harm Defendants and serves the public interests. For these reasons, Carrington Place respectfully requests an order immediately enjoining Defendants from continuation of the July 25, 2014 suspension of Medicare payments and prepayment review of Medicare SNF services.

## CERTIFICATE OF COMPLIANCE WITH FRCP 65 AND LR 65.1

Plaintiff's counsel hereby certifies that actual notice of the time of making the application, and copies of all pleadings and other papers filed in the action to date or to be presented at the hearing, have been furnished to the adverse party's attorney, if known, otherwise to the adverse party.

**BROAD AND CASSEL**
*Attorneys for Plaintiff*

By: [signature]
**Michael J. Bittman, P.A.**
Florida Bar No. 0347132
Florida Bar Board Certified Health Lawyer
Kimberly Doud, Esquire
Florida Bar No. 0523771
Bank of America Building
390 N. Orange Ave., Ste. 1400
Orlando, FL 32801
Telephone: (407) 839-4200
Facsimile: (407) 839-2122
mbittman@broadandcassel.com
kdoud@broadandcassel.com
cpittman@broadandcassel.com

**LESTER J. PERLING, P.A.**
Florida Bar No. 13854
Florida Bar Board Certified Health Lawyer
One Financial Plaza, Suite 2700
Fort Lauderdale, Florida 33394
Telephone: (954) 764-7060
Facsimile: (954) 713-0968
lperling@broadandcassel.com

**LAWRENCE W. PETTIETTE, JR.**
Pettiette Armand Dunkelman
Woodley Byrd Cromwell, L.L.P.
400 Texas Street
Suite 400
Shreveport, Louisiana 71101
Telephone: (318) 221-1800
Fax: (318) 226-0390
lpettiette@padwbc.com